# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

STEPHEN A. MARTINEZ,

               **Plaintiff,**

v.                                      **Case No. 10-C-1081**

HARLEY-DAVIDSON, INC.,[1]

               **Defendant.**

# DECISION AND ORDER

        This action filed by Plaintiff Stephen A. Martinez ("Martinez"), a former employee of the Defendant, Harley-Davidson Inc. ("Harley"), comes before the Court on Martinez's motion for partial summary judgment on his claim alleging that Harley violated the Family & Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*, by interfering with his intermittent FMLA leave for his serious health condition (first claim), and Harley's motion for summary judgment dismissing Martinez's FMLA claims for interference and retaliation (second claim).[2] This Decision and Order addresses the pending motions.

---

[1]Harley asserts that it is a wholly-owned subsidiary of Harley-Davidson Motor Company Operations, Inc. ("Harley Motor") and that the parent company is the proper Defendant. However, Martinez has not filed a motion to amend his Complaint to substitute Harley Motor as the Defendant.

[2]The Complaint also included a third claim for state common law defamation. However, by a September 30. 2011, Order, approving the parties' stipulation, the defamation claim was dismissed.

Jurisdiction over Martinez's FMLA claims is afforded by 28 U.S.C. § 1331. Venue is proper in this District under 28 U.S.C. § 1391(b).

## Summary Judgment Standards

An initial question is whether there is a genuine dispute of material fact precluding resolution of this action upon summary judgment. In making that determination, the Court applies the following criteria to the parties' proposed statements of material fact ("PSOF").

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, "a party may move for summary judgment, identifying each claim . . . on which summary judgment is sought." This Court must view the facts in the light most favorable to the non-movant, resolving all evidentiary conflicts in his favor and according him the benefit of all reasonable inferences that may be drawn from the record. *See O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). When considering cross-motions for summary judgment, the Court construes all inferences in favor of the party against whom the motion under consideration is made. *Allen v. City of Chicago*, 351 F.3d 306, 311 (7th Cir. 2003)

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Put another way, summary judgment is appropriate when there are no genuine factual issues that could lead a

2

reasonable jury to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

Although the moving party bears the initial burden of informing the Court of the basis for its motion, it may satisfy its burden by simply showing or pointing out to the Court that there is an absence of evidence supporting the non-moving party's case. *Celotex*, 477 U.S. at 325. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient to withstand summary judgment. *See Anderson*, 477 U.S. at 252.

Summary judgment is not a substitute for a trial on the merits or a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). But if it is clear that the non-movant will be unable to establish an essential element of his claim, summary judgment is not only appropriate, but mandated. *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006) (citing *Celotex*, 477 U.S. at 322-23).

### Relevant Facts[3]

For over a decade, Martinez was employed as a Powertrain Tech I - Machinist by Harley, an iconic American company synonymous with authoritative motorcycles with reverberating roars. Harley hired Martinez on September 25, 1995, for that position and he remained in that position for the duration of his employment at Harley. Martinez worked at Harley's Capitol Drive and Pilgrim Road facilities where Harley manufactures powertrains for its motorcycles. Harley is a covered employer under the FMLA.

---

[3]The relevant facts are based on the parties' proposed statements of fact to the extent that they are undisputed. Citations to all quoted excerpts, including undisputed facts, are provided.

3

When Harley terminated Martinez's employment, he was working at the Capitol Drive facility. In 2008, Harley employed approximately 500 bargaining unit employees at that facility. To meet production requirements, Harley schedules its employees to work in a three-shift around-the-clock operation. Integral to meeting its production demands, Harley has had a long-standing "Absentee Control Policy," that makes clear its employees are expected to attend work when they are scheduled to work.

Specifically, Harley's absentee control policy establishes that:

> Employees are expected to strive for perfect attendance. An absentee is defined as an employee who fails to work as scheduled for any reason. Absenteeism will be subject to the appropriate disciplinary action up to and including discharge based on the control program.

(Couden Aff. ¶¶ 26-27, Exs. F-1 & F-2.) (ECF No. 37, Attach. 6.) As a result of chronic absenteeism problems that the old absentee control policy had failed to resolve, Harley negotiated changes to the policy in 2008.

The "new" absentee control policy (the "Policy") was negotiated as part of bargaining over the parties' collective bargaining agreement (the "CBA") and went into effect on July 1, 2008. The Policy was incorporated into the 2008-2012 CBA between Harley and Martinez' Union. The Policy is a modified "no fault" attendance policy: an employee who is absent, tardy, late to call-in, or fails to call-in entirely, regardless of the reason, is assessed "occurrences" or points.

4

The Policy states that "[t]he following kinds of absences, when prearranged and in accordance with Company policy, are not counted as occurrences in determining the existence of excessive absenteeism." (Martinez Decl. ¶ 2, Ex. 3 (Def.'s Resp. Req. No. 2, HD-SM Bates 258 & Resp. Req. No. 3, HD-SM Bates 173.)) (ECF Nos. 27, 27-3.) These absences include absences for vacation, leaves of absence, occupational illness or injury, Harley business, Union business, lack of work, disciplinary suspension, bereavement, rollover days, military leave, jury duty, and FMLA.

An employee's occurrence points vary based on the type of attendance violation or infraction. For example, an employee who calls in sick and misses work on three separate non-consecutive days is assessed three occurrence points. However, only one point is assessed, if an employee is out sick for a block of consecutive days. Personal and "other" days are assessed one occurrence point per missed day; a late arrival within two hours of an employee's shift start is assessed .50 point, and an early departure (within the first two hours of the shift start time) is assessed one point. The absentee control policy also includes a timely call-in requirement. Specifically, employees must notify the Company at least 30 minutes before their scheduled shift start time should they need to miss work for any reason.

The call-in requirement is contained in the CBA and provides that:

> Employees who must be absent from work are expected to telephone or otherwise properly notify the Employer at least one half (1/2) hour prior to the start of their scheduled shift on the first (1st) day absent and give the reason for the absence and expected date of return.

5

(Couden Aff. ¶ 4, Ex. C-1 (Art. XIII, Section 3(c)) 49.) Harley requires adherence to the call-in requirement unless the employee provides documentation to support an inability to comply with that requirement and then that documentation would be reviewed.[4] (*Id*. at ¶ 2, Ex. A (Tr. December 11, 2009, Arbitration Hr'g between Harley and Martinez; Test. of Susan Fobes ("Fobes")) 181:5-10.)

The Policy states that a punctual call-in is one that is made "before the start of the first scheduled shift of an absence consistent with the requirements outlined in the [CBA]." (*Id.*, Ex. A, 99; Martinez Decl. ¶ 2, Ex. 3 (Def. Resp. Req. 16 & Req. No. 3, HD-SM 173 - 174).) If employees call-in or otherwise properly notify Harley of their absence, give the reason for the absence and the expected date of return, but do so less than 30 minutes before or four hours after their scheduled shift start time, it is considered a non-punctual or late call-in under the Policy. [5]

To report an absence, employees phone Harley's "call-in hotline," enter their employee ID number and select the type of absence by following the automated prompt and pressing the appropriate key(s) on the phone that correspond to the type of absence. When an

---

[4]Martinez objects to paragraph 19 of Harley's statement of proposed material facts, the basis for the foregoing sentence, as follows "Objection, calls for a legal conclusion; subject to that objection, DENY; see this lawsuit." Neither objection raises a factual dispute. The proposed fact does not call for a legal conclusion. The cited testimony is about how Harley applies the provision. And, a conclusory denial and a citation to this entire action, does not contain a citation to factual material as is required to raise a dispute of fact.

[5]The sentence is based on paragraph 15 of Martinez's statement of proposed material facts which is undisputed and states "[i]f employees call-in or otherwise properly notify Harley of their absence, give the reason for the absence, and the expected date of return, but do so 30 minutes before or four hours after their scheduled shift start time, it is considered a non-punctual or late call-in under the Policy." However, the Court has inserted the words "less than" before the phrases "30 minutes" to make the statement accurate.

employee calls-in to report his absence under the Policy, there is a specific code that he must enter that corresponds to FMLA leave or FMLA absence.

Under the Policy, an employee who fails to meet Harley's timely notification requirement is assessed .25 of an occurrence point, and if an employee does not call-in his absence, or does not do so within the first four hours of his scheduled shift start time, he is assessed .50 of an occurrence point.

While affirmation of the 30-minute call-in requirement was one of the changes under the Policy effective July 1, 2008, Martinez was aware of Harley's 30-minute call-in requirement by at least July 28, 2008, and understood that he would be assessed occurrences if he failed to comply with the requirement. Harley's 30-minute call-in requirement was explicitly referenced in the written memo that Martinez was given at the time of his suspension in July of 2008 for violation of the attendance policy – including violations for failure to call in at least 30 minutes prior to his shift.

Discipline under the Policy is based on the number of occurrence points an employee receives within a certain period of time. For example, a verbal warning is issued after an employee accumulates three occurrence points within a consecutive 60-day period. A written warning is issued following the accumulation of three additional occurrence points within a consecutive 75-day period following the verbal warning. A three-day suspension is issued after the written warning has been issued and the employee accumulates two additional

Case 2:10-cv-01081-RTR   Filed 09/06/12   Page 7 of 40   Document 47

occurrences in the subsequent 120 days. An indefinite suspension is issued upon the accumulation of two occurrences within 120 days of the three-day suspension.

The Policy is mechanical in the sense that it determines the appropriate level of discipline based on past infractions and length of time. However, under certain circumstances, an employee absence or tardy will not count in the assessment of occurrence points if qualified as one of the specified types of absences that "are not counted as occurrences in determining the existence of excessive absenteeism." (*Id.* at ¶¶ 4, 6-7, 26-27, Exs. C-1, C-3 (Absentee Control Policy), C-4 (Wisconsin Operations Absentee Control Policy), F-1 (Absentee Control Policy), & F-2 (Wisconsin Operations Absentee Control Policy).) Qualified FMLA, vacation time, leaves of absences, union business, jury duty, among others, are exempt from the accumulation of occurrences.

The Policy allows an employee to ". . . erase a bad record, [and allow the employee] not to continue to repeat a poor record." (*Id.* at ¶ 2, Ex. C-1, 116.) Under the "Corrective Discipline Phase-Out" section of the Policy, occurrences are removed from an employee's record during the "phase out period," which is based on the employee's most recent discipline. Further, in addition to permitting an employee to be off work for an unlimited number of days for any reason exempted by the Policy, an employee could actually be absent for several consecutive days and still receive only one occurrence point.

Employees' attendance records are tracked by a computer program that automatically calculates the number of days between absence occurrences, alerts management

8

when the occurrences reach a level warranting new discipline, and indicates the level of discipline to be issued based on the number of occurrences and the application of the "phase-out." An employee may grieve any discipline issued under the Policy. A grievance may be filed for any step under the Policy, including a verbal warning.

The Policy, effective July 1, 2008, differs from Harley's old policy in several ways. First, it extends the length of time that discipline may be issued for occurrences. For example, under the new Policy, a written warning is issued after the accumulation of three occurrences within 75 days following a verbal warning. Under the old policy, the three occurrences had to be accumulated within 60 days of the verbal warning.

The new Policy lengthens the time in which points remain active and do not phase-out. Additionally, the new Policy imposed a more stringent time limit for the call-in requirement. The old policy stated only that "Punctual Call-In" meant "[r]eport of an absence made before the start of the first scheduled shift of an absence." (*Id*. at ¶¶ 6, 26; Exs. C-3, F-1)). Under the new Policy, the change reflecting enforcement of the 30-minute call-in requirement as set forth in the CBA was explicitly referenced under the "Punctual Call-In" definition as follows: "Report of absence made before the start of the first scheduled shift of an absence consistent with the requirements outlined in the [CBA]. (*Id*. at ¶¶ 7, 27; Exs. C-4, F-2.) Accordingly, under the new Policy, an employee is issued a .25 point for failing to report an absence at least 30 minutes prior to the employee's shift start time. Since the new Policy was negotiated, voted on, and incorporated into the CBA, employees were aware of its terms.

9

Further, Harley communicated the terms of the new Policy to all bargaining unit employees through their supervisors (known at Harley as "Work Group Advisors" or "WGAs") and Union representatives. Specifically, in her capacity as Senior Human Resources ("HR") Generalist at the Capitol Drive facility, Fobes, along with other members of the HR Department, met bi-weekly with the WGAs and union stewards to communicate and outline the terms of the new Policy. During Martinez's employment and at the time of Martinez's termination, Fobes worked with the Policy.

The new "Wisconsin Operations Absentee Control Policy" or the "blue card" was distributed to the workforce and spells out the terms of the new Policy. The Policy was also posted on bulletin boards throughout the plant.

*FMLA Leave*

Harley provides FMLA leave to eligible employees. Thus, FMLA-covered absences (or other approved leaves of absence) do not count as occurrences under Harley-Davidson's Policy.

Harley has an Occupational Health/Health Services Department ("Occupational Health" or the "Department"), consisting of nurses, medical assistants, case managers, and physical and occupational therapists. Occupational Health administers all FMLA and short-term disability leave requests and approvals, and determines whether an employee is eligible for and entitled to use FMLA leave. Caroline O'Connell ("O'Connell") is Occupational Health's Lead for Harley's Wisconsin operations.

Occupational Health receives notice an employee is requesting FMLA leave in a variety of ways, including by means of Harley's automated telephone hotline. Consistent with the FMLA's requirements, an employee requesting FMLA for an unforeseen absence must make a request within two business days upon returning to work. Harley's consistent practice is to reject FMLA leave requests for unforeseen absences made more than two days after the employee's return to work, and to reject untimely, backdated medical excuses in support of FMLA leave requests.

Upon being notified that an employee may need FMLA leave, Occupational Health provides the employee with a health care provider certification form that employees are required to return within 15 days from the time the request is made. Harley may grant an extension to an employee if it determines the circumstances justify additional time. At Harley, in order for an employee to be approved for and granted intermittent FMLA leave, the employee must complete an initial FMLA application and a health care provider certification form, and return both to Occupational Health. Occupational Health keeps a detailed contemporaneous log of all interactions it has with employees. The log records the details of discussions that Occupational Health nurses or others in the department have with an employee about leave issues.

In order for an employee to properly utilize already approved intermittent FMLA leave for an unforeseen absence, Harley has two requirements: (1) before the absence, the employee must comply with the Policy by calling Harley's call-in hotline at least 30 minutes

11

prior to the shift start time and indicating that FMLA leave is the reason for the absence; and (2) within two business days of returning to work from the absence, the employee must complete and submit an "FMLA request half-slip" to Occupational Health to support that the absence is FMLA qualifying. The FMLA form must be submitted to Occupational Health, in person or by placing the form in its "lockbox." Because employees may have intermittent leave pre-approved for a variety of different reasons at the same time, the employee must identify the type of leave requested for each absence.

Harley requires employees who are using intermittent FMLA to comply with the Company's timely call-in requirements. Employees are initially assessed attendance occurrence points for absences pending FMLA certification. Harley does so because it is under a contractual ten-day time limit within which it may issue discipline. In such circumstances, Harley explains to the employee that the discipline is only being issued because of the ten-day requirement and, if the leave is subsequently certified as FMLA leave, the points and proposed discipline will be removed.

If an employee fails to, in accordance with the Policy, timely call-in before his absence to indicate that FMLA leave is the reason for the absence, the employee is assessed .25 occurrence point, even if after the absence, within two business days of returning to work, and "[c]onsistent with the FMLA's requirements," the employee completes and submits an "FMLA request half-slip" to Occupational Health to support that the absence should be FMLA qualifying. The call-in requirement under the Policy applies to employees already approved

12

for intermittent FMLA leave who have unforeseen absences unless the employee indicates and provides supporting documentation to Occupational Health upon returning to work that the employee could not meet the call-in requirement under the Policy because of that employee's FMLA condition. If those requirements are met, Occupational Health reviews the documentation and considers removing the .25 occurrence point issued against the employee under the Policy.

Martinez made extensive use of FMLA leave and approved medical leaves to be absent from work frequently in 2005, 2006, 2007 and 2008, which made him aware of Harley's FMLA procedures. Harley did not contest whether Martinez had a serious health condition.

Martinez was off of work intermittently throughout 2007 and 2008 due to depression. There was never any reason for Harley to seek a second opinion concerning Martinez's absences from work. Harley never sought a second opinion regarding Martinez's depression/serious health condition. Martinez was entitled to FMLA leave for his absences from work on the days he applied for FMLA leave from August through November 2008. Martinez was also frequently absent and tardy or otherwise incurred attendance points for reasons that were unrelated to any medical condition.

Throughout Martinez's employment and in the three years before his discharge, Martinez frequently accumulated sufficient occurrences to warrant discipline under

13

Harley-Davidson's Absentee Control Policy. For instance, from November 19, 2005 through January 2, 2007, he received numerous verbal and written warnings for his poor attendance. After receiving a verbal warning on January 2, 2007, he received a written warning on February 2, 2007. Neither Martinez nor the Union filed a grievance over the written warning.

By March 2, 2007, Martinez had incurred sufficient points to receive a three-day working suspension, which was issued on March 8, 2007. Again, no grievance was filed over that disciplinary suspension. Following his March 2007, three-day working suspension, Martinez received an indefinite suspension due to having accumulated a sufficient number of occurrence points between May 4 and June 25, 2007. However, Martinez contested several of the points he had been assessed, and a grievance was filed over the suspension.

On July 11, 2007, the HR Manager at the Capital Drive facility, Robert Johnson ("Johnson"), who was involved in making disciplinary decisions under the Policy, decided to remove Martinez's indefinite suspension from his record and turn it into a five-day suspension under a last chance agreement because Harley had questions about some of the dates and it was willing to give Martinez the benefit of the doubt. Johnson reported directly to Sarah Grabowski ("Grabowski"), Harley's HR Director, during the time Martinez worked for Harley.

On December 3, 2007, Harley sent letters to employees, including Martinez, who were considered habitual offenders under its absentee policy. The letter stated that, while it was not disciplinary in nature, its intent was to notify Martinez that his attendance record was

14

in need of improvement. The letter also stated that beginning in 2008, Harley would take further steps to address habitual absenteeism and that offenders with habitual absenteeism would be required to make significant improvement to their records.

Harley approved Martinez for intermittent FMLA leave for his serious health condition at various times from February 13 to June 13, 2008, from June 18 to September 18, 2008, and from October 25, 2008 to February 25, 2009. By March 29, 2008, Martinez had incurred sufficient absences to warrant discipline under the Policy for attendance infractions between March 11 and March 29, 2008.

The attendance tracking program initially indicated that Martinez was at the indefinite suspension/termination review stage. A meeting to address the indefinite suspension was attended by Martinez's WGA, Dale Paczesny ("Paczesny"), Fobes, Martinez, and Union Steward Ernest Agee ("Agee").[6] At the meeting, Martinez raised concerns that the level of discipline he was to receive was incorrect because it took into account occurrences related to the 2007 suspension that had been removed from his record. Upon review, Fobes confirmed the 2007 occurrences were removed and all parties agreed that Martinez should, in fact, receive a written warning, not an indefinite suspension. Accordingly, Martinez was issued a written warning on March 29, 2008. The written warning was not grieved.

On May 30, 2008, Martinez was absent from work. Martinez called-in his absence and indicated that it was for FMLA pursuant to the Policy, but Martinez was late to

---

[6]The date of the meeting is not included in the parties' proposed findings of fact or disclosed by the cited underlying factual materials. (*See* Pl.'s Resp. Def.'s PSOF ¶ 84.)

15

call-in his absence pursuant to the Policy. Harley assessed Martinez 1.0 occurrence point for his absence and .25 occurrence point for his late call-in on May 30, 2008. Within two business days upon his return to work from this absence, Martinez completed and submitted an "FMLA request half-slip" to Occupational Health to support that his absence on May 30, 2008, was FMLA qualifying. Harley did not remove the .25 occurrence point for Martinez's late call-in on May 30, 2008.

On July 1, 2008, Martinez was absent from work. Martinez called-in his absence and indicated that it was for FMLA pursuant to the Policy, however, Martinez was late to call-in his absence pursuant to the Policy; his scheduled shift started at 3:00 p.m, but he called-in his absence at 2:55 p.m. Harley assessed Martinez 1.0 occurrence point for his absence and .25 occurrence point for his late call-in on July 1, 2008. Within two business days upon his return to work from this absence, Martinez completed and submitted an "FMLA request half-slip" to Occupational Health to support that his July 1, 2008, absence was FMLA qualifying. Harley removed the 1.0 occurrence point for Martinez's absence, however, it did not remove .25 occurrence point for his late call-in on July 1, 2008.

On July 11, 2008, Martinez was absent from work. His scheduled shift started at 3:00 p.m. and Martinez called-in his absence at 2:33 p.m., indicating that it was for FMLA pursuant to the Policy. This was a late call-in pursuant to the Policy, and Harley assessed Martinez 1.0 occurrence point for his absence, and .25 occurrence point for his late call-in on July 11, 2008. Within two business days upon his return to work from this absence, Martinez

16

completed and submitted an "FMLA request half-slip" to Occupational Health. After receiving Martinez's completed "FMLA request half-slip" supporting that his absence on July 11, 2008, was FMLA qualifying, Harley removed the 1.0 occurrence point for his July 11, 2008, absence. Harley did not remove the .25 occurrence point for Martinez's late call-in.

Because Harley wanted to clearly communicate where Martinez stood regarding his occurrence points and make sure that he understood the terms of the new Policy and its impact on him, Harley met with Martinez on July 28, 2008, and provided him and the Union with a detailed letter outlining Martinez's attendance occurrences since July 2007. Fobes and Johnson drafted the letter. Fobes was involved in issuing Martinez's three-day suspension on July 28, 2008.

The letter explains, "Per [Occupational] Health a total of 7.50 points were removed due to approved FMLA and timely submitting of FMLA request forms (within 2 business days of return from intermittent absences)" and it lists all of the FMLA-related points that were removed from Martinez's record. (*Id*. at ¶¶ 2, 19, 39; Exs. A 72:16-73:13; D-10, 2; Ex. F-14, 2).) The letter further states that, on days that had been excused as intermittent FMLA days, Martinez was still assessed a .25 occurrence point because of his failure to comply with Harley's 30-minute call-in requirement. Specifically, it states: "07/01/08 1.5 removed (.25 remains due to late call-in @ 2:55pm for a 3:00 p.m. shift start, [P]olicy defines timely call-in as 30 minutes prior to scheduled shift start time)[;] 07/11/08 1.0 removed (.25 remains [due to] late call-in @ 2:33 pm for a 3:00 p.m. shift start, [P]olicy defines timely

17

call-in as 430 [sic] minutes prior to scheduled shift start time).  (*Id*. at ¶¶ 19, 39; Exs. D-10,

Ex. F-14, 2.)

> In conclusion, the letter advised Martinez as follows:

> Based on your continued accrual of points [Harley] remains concerned that you are making little progress towards erasing a bad attendance record, but rather are continuing to repeat a poor record in violation of the [Policy]. We encourage you to take the time with your Union representatives to ensure you fully understand the changes that went into effect July 1, 2008 and wish you success in your endeavor to work towards improving your attendance at work.

(*Id*., Exs. D-10, 2; F-14.)

At no time during July 28, 2008, meeting did Martinez or his Union

representatives suggest that  Martinez was unaware of the call-in requirement or that he was

unable to comply with the requirement due to a medical condition. Martinez sometimes called

to report his anticipated absence at least 30 minutes prior to his scheduled start time, which

was typically at 3:00 p.m. or later.   Neither Martinez nor the Union suggested that the points

were improperly assessed or the suspension was not warranted under the policy and thus no

grievance was filed in connection with the July 28, 2008, suspension.  Following Martinez's

three-day suspension in July 2008, he was at a "step 4" under the Policy, which meant that if

he was assessed two occurrence points under the Policy within the next 120 days thereafter it

would result in his indefinite suspension and a termination review.   Harley issued Martinez

a three-day suspension on July 28, 2008, effective July 28 through July 30, 2008, based on, in

18

part, the occurrence points Harley issued to him on July 1, and July 11, 2008, for calling-in late pursuant to the Policy.

On August 8, 2008, Martinez was absent from work. His scheduled shift started at 3:00 p.m. Martinez called-in his absence at 2:47 p.m. and indicated that it was for FMLA pursuant to the Policy. This was a late call-in pursuant to the Policy. Harley assessed Martinez 1.0 occurrence point for his absence on August 8, 2008, and .25 occurrence point for his late call-in on August 8, 2008. Within two business days upon his return to work from this absence, Martinez completed and submitted an "FMLA request half-slip" to Occupational Health to support that his August 8, 2008, absence was FMLA qualifying. After receiving Martinez's completed "FMLA request half-slip," Harley removed the 1.0 occurrence point for that absence. Harley did not remove the .25 occurrence point for Martinez's late call-in on August 8, 2008.

On August 22, 2008, Martinez was absent from work. Martinez called-in his absence and indicated that it was for FMLA in accordance with the Policy, however, he was late to call-in his absence pursuant to the Policy. Harley assessed Martinez 1.0 occurrence point for the absence, and .25 of an occurrence point for his late call-in on August 22, 2008. Within two business days upon returning to work, Martinez completed and submitted an "FMLA request half-slip" to Occupational Health to establish that the absence on August 22, 2008, was FMLA qualifying. After receiving Martinez's completed "FMLA request half-slip," Harley removed the 1.0 occurrence point for Martinez's absence on August 22,

19

2008, but did not remove the .25 occurrence point for Martinez's late call-in on August 22, 2008.

On October 25, 2008, Martinez was absent from work. He called-in his absence and indicated that it was for FMLA pursuant to the Policy. Martinez's scheduled shift started at 11:00 a.m. and he called-in his absence at 12:20 p.m. This was a late call-in pursuant to the Policy. Harley assessed Martinez 1.0 occurrence point for his absence and a .25 occurrence point for his late call-in on October 25, 2008. Within two business days upon his return to work from this absence, Martinez completed and submitted an "FMLA request half-slip" to Occupational Health. After receiving Martinez's completed "FMLA request half-slip" indicating that his absence on October 25, 2008, was FMLA qualifying, Harley removed the 1.0 occurrence point for the absence. Harley did not remove the .25 occurrence point for Martinez's late call-in on October 25, 2008.

On November 8, 2008, Martinez was absent from work. Martinez called-in his absence and indicated that it was for FMLA pursuant to the Policy. Martinez's scheduled shift started at 7:00 p.m. and he called-in his absence at 8:31 p.m. Martinez was late to call-in his absence pursuant to the Policy. Harley assessed Martinez 1.0 occurrence point for his absence and .25 occurrence point for his late call-in on November 8, 2008. Within two business days upon his return to work from this absence, Martinez completed and submitted an "FMLA request half-slip" to Occupational Health to support that his absence on November 8, 2008 was FMLA qualifying. After receiving Martinez's completed "FMLA request half-slip,"

20

Harley removed the 1.0 occurrence point for Martinez's absence. Harley did not remove the .25 occurrence point for Martinez's late November 8, 2008, call-in.

On November 9, 2008, Martinez was absent from work. Martinez called-in his absence and indicated that it was for FMLA pursuant to the Policy, however, Martinez was late to call-in his absence pursuant to the Policy. Harley assessed Martinez 1.0 occurrence point for his absence and .25 occurrence point for his late call-in. Within two business days upon his return to work from this absence, Martinez completed and submitted an "FMLA request half-slip" to Occupational Health. After receiving Martinez's completed "FMLA request half-slip," supporting that his absence on November 9, 2008, was FMLA qualifying, Harley removed the 1.0 occurrence point for Martinez's absence. Harley did not remove the .25 occurrence point for Martinez's late call-in on November 9, 2008.

As of November 19, 2008, Martinez had accumulated sufficient points to trigger an indefinite suspension and termination review. Specifically, a disciplinary action was triggered based on the following occurrences: .25 point for a late call-in on August, 8, 2008; .50 point for late arrival on October 2, 2008; .75 point for late arrival and late call-in on October 17, 2008; 1.25 points for pending FMLA leave and late call-in on October 25, 2008; 1.25 points for pending FMLA leave and late call-in on November 8, 2008; and .25 point for late call-in on November 9, 2008.

When an employee reaches the level of indefinite suspension, HR convenes a joint meeting with the WGA, the bargaining committee, the Union steward and the employee,

21

before the employee is suspended. At the meeting, Harley issues the indefinite suspension, takes the employee's badge and begins its investigation.

Harley issued Martinez an indefinite suspension on November 21, 2008, effective that day, based on the three-day suspension issued to him on July 28, 2008, and the occurrence points issued to him on August 8, August 11, October 25, November 8, and November 9, 2008 for calling-in late pursuant to the Policy on those days.

Prior to the November 2008 indefinite suspension meeting regarding Martinez's attendance violations, Fobes had analyzed the occurrence points that Martinez had received following his July 2008 three-day suspension. Fobes did so because Martinez was on intermittent FMLA and prior to issuing a suspension she wanted to verify his "active" points and be sure that Martinez had indeed reached two additional occurrences triggering an indefinite suspension and termination review. Fobes reviewed the data from Harley's computer tracking system and Harley's call-in records, as well as Martinez's late call-in history. In the process, Fobes created an Excel spreadsheet showing the points that were not subject to potential removal (e.g., days Martinez did not show for work on time that were non-FMLA related) and the points that might be removed pursuant to FMLA approval. After reviewing the data, Fobes concluded that, even excluding all of the pending FMLA requests, Martinez had still reached the two-point threshold to trigger an indefinite suspension and termination review.

22

Fobes was involved in issuing Martinez's indefinite suspension on November 21, 2008. Having analyzed the attendance information, Fobes and WGA Shawn Mallory ("Mallory") met with Martinez and his Union representatives on November 21, 2008, to discuss Martinez's indefinite suspension. During the meeting, Jason Adams ("Adams"), one of the Union representatives, questioned the issue of pending FMLA points and their potential impact on the disciplinary decision. Fobes discussed Martinez's occurrence points with the Union and Martinez, explaining that, even assuming Martinez's pending FMLA requests would be granted, Martinez had still accumulated the points necessary for an indefinite suspension. Neither the Union nor Martinez raised any questions about Fobes' calculation of the points nor contended that the points had been improperly assessed. No claim was made that Martinez was unable to meet the timely call-in requirement due to his medical condition.

Following the meeting, the Union filed a grievance over the indefinite suspension. Although the grievance form stated that Martinez "had been unjustly terminated," his employment had not been terminated and was instead pending review.

Under the grievance procedures, an indefinite suspension proceeds immediately to the "third step." At the November 25, 2008, third step meeting between Johnson and Martinez's Union representative(s), they again reviewed the assessment of points analysis prepared by Fobes. Again, Martinez's Union representatives did not contest any of the points or that the analysis was incorrect, nor did they suggest that Martinez was unaware of the call-in

23

requirement or that he was unable to meet the call-in requirement due to his FMLA condition or otherwise.

Fobes recommended to Johnson that Harley terminate Martinez's employment. Johnson made the decision to terminate Martinez's employment, which was approved by Grabowski. Having reviewed the occurrence points with the Union and concluded that Martinez had, in fact, accrued points warranting termination, Johnson decided to terminate Martinez's employment effective on December 2, 2008. On that date, Harley terminated Martinez's employment for violating its Policy. As of December 2, 2008, Martinez had been employed for 12 months, had worked at least 1,250 hours during the prior 12 months, and had not exceeded 12 weeks of FMLA leave for any FMLA leave period.[7] Martinez was not a key employee for FMLA purposes.[8]

On December 2, 2008, the Union filed a separate grievance over Martinez's termination, stating that Martinez had "been unjustly terminated per Art. VII Sec. 3 and any and all other applicable articles or sections of the labor agreement." (*Id*. at ¶ 5, Ex. C-2.) No specific grounds were alleged.

Grievances over terminations begin at step three. On December 9, 2008, a step three grievance meeting was held between Mike Masik ("Masik"), the Union president, and

---

[7]The FMLA "applies only to employees who have worked for the employer for at least one year and provided 1,250 hours of service within the last 12 months, § 2611(2)(A). *Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 739 (2003).

[8]The FMLA does not apply to employees in high-ranking or sensitive positions. *Id*. (citing 29 U.S.C. §§ 2611(2)(B)(i) and (3))).

24

Johnson. At the meeting, Johnson and Masik again reviewed the attendance points on which Harley had based its decision to terminate Martinez's employment. Masik did not raise any argument that Martinez was unable to meet the 30 minute call-in requirement due to his medical condition.

After the meeting, Harley responded to the grievance via a letter from Johnson that memorialized the December 9, 2008, meeting and stated that Harley had properly assessed occurrence points to Martinez in accordance with its attendance policy. In denying the grievance, Johnson stated:

> [Harley] contends that absenteeism is a costly issue not only to the business from a monetary perspective, but to employees who report to work and must cover for those absences. It is [Harley's] position the accumulative points were issued properly and that the grievant had legitimately progressed to the Termination step of the H-D Attendance Policy and respectfully denies the grievance.

(*Id*. at ¶ 5, Ex. C-2, 2.) The letter was hand-delivered to Masik in order to notify the Union that the next step in the grievance process was arbitration.

On June 9, 2009, six months after the termination of his employment, Martinez visited the office of his physician, Dr. David Jenks ("Jenks"), to obtain a backdated excuse for his failure to timely call-in on days he exercised intermittent FMLA leave. At that time, Martinez brought in some old FMLA forms to Jenks' office and informed Jenks' medical assistant that his job required him to provide a letter stating the definition of incapacitation along with the form. In particular, Martinez said that the letter needed to state that "due to depressive disorder patient was incapacitated and was unable to call in to work during these

25

times." (*Id.* at ¶¶ 2, 25; Exs. A 121:5-122:9; E-2.) Jenks stated, "Correct, I had no problem with the language that was requested." (*Id.* at ¶ 2, Ex. A 122:18-19.) Jenks authorized the letter with minimal, if any, review of Martinez's medical records and no interaction with Martinez. Jenks' medical assistant called Martinez back and asked if he needed any specific dates mentioned. Martinez said he did not.

However, on July 7, 2009, Martinez called Jenks' office and requested the letter be changed to specify dates – going back to 2008 and including July 1, July 11, August 8, August 22, October 25, and November 8, 2008 – on which he was unable to call-in because of his medical condition. Within 20 minutes of receiving Martinez's request, Jenks authorized the letter as Martinez requested. Shortly after Jenks prepared the July 2009 letter, the Union provided it to Harley – specifically to Grabowski.

Contrary to Martinez's suggestion to Jenks' office, Harley had not requested the letter. Seven months after the termination of Martinez's employment, when Harley received the July 2009 letter from Jenks, was the first time that Harley received any suggestion from either Martinez or the Union that Martinez was unable to meet the call-in requirement due to his medical condition. When Grabowski asked the Union why an excuse was being submitted so long after-the-fact, the Union had no explanation.

Harley did not reverse its decision to terminate Martinez's employment. Instead, Harley and the Union proceeded to arbitration. Following an arbitration hearing conducted

26

on December 11, and 16, 2009, an independent arbitrator upheld Harley's decision to terminate Martinez's employment.

At the hearing, Jenks acknowledged that given the length of time and the fact that Martinez had not been seen by Jenks (or any medical provider) on any of the dates in question, the most he could say with any medical degree of certainty was that Martinez "may" have been unable to call in on those days. (*Id*. at ¶ 2, Ex. A 131:4-134:5.) Jenks further testified:

> I was trying to phrase it that he may not have been able due to his condition to call in on a timely basis, because he may not have gotten to bed on time, woken up on time; he may not have had the motivation to get out of bed after he did wake up. I'm not – of course I can't verify what time he actually did wake up or any of that but that his condition certainly could have been on that particular day – dates that are listed where he may not have been able to do what he was supposed to because of his condition.

(*Id*., Ex. A. 133-34.) Martinez's medical records show, and Martinez agrees, that his absences on November 8 and 9, 2008, were in connection with pneumonia.

During the arbitration hearing, Martinez testified as follows:

Q: [Y]ou previously testified that you had already told [your Union representative] in October that you were medically incapable of calling in on days when you were assessed points; correct?

A: I brung that to his attention.

Q: And is it your contention that you didn't raise that issue in connection with your termination because you didn't want managers to know that you were medically incapable of calling in?

27

A: I wanted my personal business private. I didn't want to discuss – I feel that I didn't have to discuss, you know, something like this with them. I mean that's how I felt.

(*Id.*, Ex. A 393:22-394:9.)

At the arbitration hearing, Harley testified that it "wanted [Martinez] to understand that even though we removed one point for the FMLA-approved absence [on July 11, 2008], we were not removing the .25 for the lack of a punctual call-in." (*Id.* at ¶ 2, Ex. A 73:7-13.) Harley further testified that Martinez was assessed .25 occurrence point because on August 8, 2008, he called-in 13 minutes prior to the scheduled start of his shift, and not at least 30 minutes prior. Harley testified it did not remove the .25 August 8, 2008, occurrence point for Martinez calling-in late pursuant to the Policy, although Martinez was approved for FMLA leave on that date.

Harley also testified that it assessed and did not remove the .25 occurrence point against Martinez on October 25, 2008, for calling-in late pursuant to the Policy, a day on which he was also approved for FMLA leave. Harley also testified that it assessed and did not remove the .25 occurrence point against Martinez on November 8, 2008, for calling-in late pursuant to the Policy, a day on which he was also approved for FMLA leave. Harley also testified that it assessed and did not remove the .25 occurrence point against Martinez on November 9, 2008, for calling-in late pursuant to the Policy, a day on which he was also approved for FMLA leave.

28

At the arbitration proceeding, O'Connell testified that an "FMLA request half-slip" does not constitute the initial intermittent FMLA leave request; rather, it is a request that an employee's absence on a particular day or for a particular time be FMLA qualifying. O'Connell was aware of health provider certification forms indicating that because of depression Martinez was intermittently incapable of performing work.

Additionally, O'Connell would have questioned the July 2009, documentation from Martinez's doctor that Martinez could not meet the call-in requirement under the Policy due to his FMLA condition because it was a backdated doctor's slip that Harley does not accept. O'Connell would have sought a second opinion from another doctor about the validity of the documentation or the employee's reason(s) for his inability to meet the call-in requirement and asked that doctor to call Martinez's doctor to discuss it. In such reference, O'Connell used the phrase "second opinion" as "a term of art" under the federal FMLA regulations when an employer disagrees with an employee's doctor about whether the employee's absence from work is certified as FMLA-qualifying.

On December 1, 2010, Martinez filed the instant action. At his February 3, 2012, deposition, Martinez testified that his medication and his sleep disorder sometimes prevented him from calling-in 30 minutes before his shift. Martinez also testified that he had a conversation in mid-2008 with Denise Reed ("Reed"),[9] Harley's plant nurse, about the call-in

---

[9] The Court has spelled the surname of Harley's plant nurse "Reed" as used in her affidavit. However, her surname is spelled "Reid" in Martinez's deposition transcript. The Court infers that the former spelling is the correct spelling of her name.

29

requirement.  However, he cannot specifically recall when his conversation with Reed occurred or what he said to Reed except that he notified her that he was "having problems with the medication." (*Id.* at ¶ 3, Ex. B 58:2-9; 108:7-109:12, 109:23-110:12.)

Reed denies that any such conversation with Martinez ever took place.  Reed's contemporaneous notes of her discussions with Martinez do not reflect any such conversation.

## Analysis

Martinez seeks partial summary judgment in his favor on his first claim, FMLA interference.  Harley seeks summary judgment dismissing both of Martinez's FMLA claims and the action, with prejudice, as well as an award of fees and costs   In response to Harley's motion, Martinez concedes that he cannot establish a  retaliation claim against Harley.  (Pl.'s Br. Opp'n Def.'s Mot. Summ. J. 21.)  Thus, to that extent Harley's motion is granted and Martinez's FMLA retaliation claim is dismissed.  The Court need only address the parties' contentions with respect to the FMLA interference claim.

By his motion, Martinez maintains that he has established an FMLA interference claim against Harley.  By its motion, Harley maintains that Martinez was terminated for violation of its Policy for hourly Wisconsin employees and the applicable CBA, and that, until seven months after the termination of his employment, Martinez did not inform Harley that he was medically unable to comply with the Policy on the days he violated it.  Harley maintains that: (1) Martinez's FMLA claims are time-barred; (2) Martinez was granted FMLA

30

leave on the days that he requested it; and (3) Martinez failed to comply with Harley's usual and customary notice requirements, which the FMLA allows Harley to enforce.

*Timeliness of Claim*

A plaintiff must file his claim for interference within two years of the date of the last event constituting the alleged violation, 29 U.S.C. § 2617(c)(1), although the statute of limitations extends to three years for willful violations, 29 U.S.C. § 2617(c)(2). Harley contends that Martinez's inference claims, based on the July 1, July 11, August 8, August 22, October 25, November 8, and November 9, 2008, dates on which he claims that .25 occurrence points were improperly assessed, are untimely. Harley relies on *Reed v. Lear Corp.*, 556 F.3d 674, 681-82 (8th Cir. 2009) and *Maher v. Int'l Paper Co.*, 600 F.Supp. 2d 940, 950-51 (W.D. Mich. 2009). Harley also asserts the claims related to Martinez's November 21, 2008, indefinite suspension and/or his July 28, 2008, three-day suspension are time-barred. Additionally, Harley maintains that because its December 2, 2008, conversion of the indefinite suspension was based on the pre-December 1, 2008, occurrence points, Martinez's challenge to the termination of his employment is also barred.

Martinez counters that his action, filed on December 1, 2010, was within two years of the final event in the chain of events leading to the termination of his employment on December 2, 2008. (Pl.'s Br. Opp'n Def.'s Mot. Summ. J. 21.) Martinez's interference claim challenging the December 1, 2008, termination of his employment is timely since it was filed

31

within two years of that date. *See Fialho v. Girl Scouts of Milwaukee Area, Inc.*, No. 06-C-1218, 2007 WL 1246433, at *2 (E.D.Wis. Apr. 30, 2007).

However, to the extent that Martinez makes separate interference claims, based on each of the dates he asserts .25 occurrence points were improperly assessed: July 1, July 11, August 8, August 22, October 25, November 8, and November 9, 2008, as well as his July 28, 2008, three-day suspension, and his November 21, 2008, indefinite suspension, they are time-barred because they were filed more than two years after the occurrence of the event. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109-13 (2002); *Groesch v. City of Springfield, Ill.*, 635 F.3d 1020, 1027 (7th Cir. 2011). Moreover, the "lingering effect of an earlier, distinct" wrong does not make a violation continuing, *see Pitts v. City of Kankakee, Ill.*, 267 F.3d 592, 595 (7th Cir. 2001).

*Interference Claim*

Next, the Court considers whether there is a genuine issue of material fact with respect to Martinez's interference claim based on the December 1, 2008, termination of his employment. A central purpose of the FMLA is to guarantee medically necessary leave to employees in a manner that accommodates the legitimate interests of employers. 29 U.S.C. § 2601; *see Aubuchon v. Knauf Fiberglass, Gmbh,* 359 F.3d 950, 951-52 (7th Cir. 2004).

Under the FMLA, eligible employees are entitled to twelve weeks unpaid leave per year for various reasons, including a "serious health condition" rendering the employee unable to perform his or her job. 29 U.S.C. § 2612(a)(1)(D); *Byrne v. Avon Prods., Inc*., 328

32

F.3d 379, 381 (7th Cir. 2003); *Stoops v. One Call Commc'ns, Inc.*, 141 F.3d 309, 312 (7th Cir. 1998). After using protected leave, eligible employees also have the right to resume his or her job or an equivalent job. *See* 29 U.S.C. § 2614(a)(1); *Ragsdale v. Wolverine World Wide, Inc.,* 535 U.S. 81, 86 (2002).

Because the FMLA provides for these substantive rights, it also provides that it is unlawful for employers to "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" by the FMLA. 29 U.S.C. § 2615(a)(1); *Nev. Dep't of Human Res.*, 538 U.S. at 724-25; *Ragsdale,* 535 U.S. at 87; *Caskey v. Colgate-Palmolive Co.*, 535 F.3d 585, 590 (7th Cir. 2008). The employee has the burden of proving FMLA interference. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 908 (7th Cir. 2008).

"To prevail on a claim for FMLA interference, the employee must prove that: (1) he was eligible for FMLA protections; (2) his employer was covered by the FMLA; (3) he was entitled to leave under the FMLA; (4) he provided sufficient notice of his intent to take FMLA leave; and (5) his employer denied him FMLA benefits to which he was entitled." *Righi v. SMC Corp.,* 632 F.3d 404, 408 (7th Cir. 2011). An interference claim does not require an employee to prove discriminatory intent on the part of the employer; rather, such a claim "requires only proof that the employer denied the employee his or her entitlements under the Act." *Shaffer v. Am. Med. Ass'n*, 662 F.3d 439, 443 (7th Cir. 2011) (quoting *Goelzer v. Sheboygan Cnty., Wis.,* 604 F.3d 987, 995 (7th Cir. 2010)); *Kauffman v. Fed. Exp. Corp.,* 426 F.3d 880, 884 (7th Cir. 2005). Interference can include termination of

33

employment. *See Kauffman*, 426 F.3d at 885. However, an employer is not liable for interference with FMLA rights if the employee would have been fired even absent to employee's right to FMLA leave. *See Kohls v. Beverly Enter. Wis., Inc.*, 259 F.3d 799, 804-05 (7th Cir. 2001).

At all times relevant to this action, the following version of 29 C.F.R. § 825.303(a),[10] applied to the requirements for an employee to furnish notice to an employer where the need for FMLA leave is not foreseeable or in other words intermittent:

> When the approximate timing of the need for leave is not foreseeable, an employee should give notice to the employer of the need for FMLA leave as *soon as practicable under the facts and circumstances of the particular case. It is expected that an employee will give notice to the employer within no more than one or two working days of learning of the need for leave, except in extraordinary circumstances where such notice is not feasible. In the case of a medical emergency requiring leave because of an employee's own serious health condition or to care for a family member with a serious health condition, written advance notice pursuant to an employer's internal rules and procedures may not be required when FMLA leave is involved.*

(emphasis added).

Also of relevance are the following provisions of related regulation, § 825.302, that were in effect while Martinez worked for Harley:

> (f) In the case of intermittent leave or leave on a reduced leave schedule which is medically necessary, an employee shall advise the employer, upon request, of the reasons why the intermittent/reduced leave schedule is necessary and of the

---

[10]The regulation was revised effective January 16, 2009. The Court applies the version in effect when these evens occurred. *See Righi,* 632 F.3d at 408-09.

34

schedule for treatment, if applicable. The employee and employer shall attempt to work out a schedule which meets the employee's needs without unduly disrupting the employer's operations, subject to the approval of the health care provider.

(g) An employer may waive employees' FMLA notice requirements. *In addition, an employer may not require compliance with stricter FMLA notice requirements where the provisions of a collective bargaining agreement, State law, or applicable leave plan allow less advance notice to the employer.* For example, if an employee (or employer) elects to substitute paid vacation leave for unpaid FMLA leave (see § 825.207), and the employer's paid vacation leave plan imposes no prior notification requirements for taking such vacation leave, no advance notice may be required for the FMLA leave taken in these circumstances. On the other hand, FMLA notice requirements would apply to a period of unpaid FMLA leave, unless the employer imposes lesser notice requirements on employees taking leave without pay.

With respect to the elements of an interference claim, it is undisputed that Martinez was eligible for FMLA protections; Harley was covered by the FMLA; and Martinez was entitled to leave under the FMLA. Only the last two elements are at issue. (*See* Def.'s Mem. Opp'n Pl.'s Mot. Partial Summ. J. 2.)

Martinez relies upon *Cavin v. Honda of America Manufacturing*, 346 F.3d 713, 720-22 (6th Cir. 2003), as establishing that he gave sufficient notice in this case. He also asserts that the Court of Appeals for this Circuit has not addressed the issue presented in this case. Harley counters that the Court of Appeals for this Circuit has held that employers may require employees to report FMLA absences in accordance with their general notice policies as long as compliance is possible, citing *Righi*, 632 F.3d at 411; *Lewis v. Holsum of Fort*

35

*Wayne, Inc.*, 278 F.3d 706, 710 (7th Cir. 2002); *Gilliam v. United Parcel Serv., Inc.,* 233 F.3d 969. 970-71 (7th Cir. 2000).

In *Cavin*, 346 F.3d at 722, the Court of Appeals for the Sixth Circuit criticized the Seventh Circuit Court of Appeals' *Lewis* decision. *Cavin* asserts that an employer cannot deny FMLA relief for failure to comply with its internal notice procedures when those procedures are more stringent than the FMLA's requirements, relying on 29 C.F.R. § 825.302(d) which states that "failure to follow . . . internal employer procedures will not permit an employer to disallow or delay an employee's taking FMLA leave if the employee gives timely verbal or other notice."

The Sixth Circuit Court of Appeals has arguably retreated from its position in Calvin. *See Allen v. Butler Cnty. Comm'rs,* 331 Fed. Appx. 389, 394-95 (6th Cir. 2009) (holding, in an unpublished opinion, that employee on FMLA leave could be terminated for violating more stringent requirements of employer's concurrent paid sick leave policy).

Moreover, both before and after *Cavin* was decided, the Court of Appeals for this Circuit has held that when an employee fails to comply with an employer's mandatory internal policies, the employee fails both to exercise FMLA rights and to provide sufficient notice of the intent to take leave and, therefore, cannot state a valid interference claim. *Brown v. Auto. Components Holdings, LLC,* 622 F.3d 685, 690 (7th Cir. 2010); *Gilliam*, 233 F.3d at 972. In both *Brown* and *Gilliam*, employees were fired for failure to comply with an attendance policy; and in both cases, the court of appeals held that the employer did not

36

interfere with the employee's FMLA rights by upholding those policies, regardless of whether the reason for the absence would qualify for leave under the FMLA. *Brown*, 622 F.3d at 690; *Gilliam*, 233 F.3d at 971-72. Earlier, in *Lewis*, 278 F.3d at 710, the Court of Appeals for this Circuit concluded that an employer did not violate the FMLA by discharging an employee who "failed to comply with applicable company rules and policies" regarding leave notice where "it was not impossible" for the employee to do so.

Martinez's request for partial summary judgment on the issue of notice relies largely on *Cavin* which is not controlling case law in this circuit. The controlling case law in this circuit allows an employer to rely upon its internal procedures to report FMLA absences in accordance with their general notice policies as long as compliance is possible.

In this case, Martinez obtained FMLA intermittent leave authorization. However, at that time and at the times that he was using that intermittent leave, Martinez did not provide any indication that his medical condition impeded him from complying with Harley's Policy that required notice of absences at least 30 minutes prior to the start of his shift. Reed's contemporaneous notes of her contacts with Martinez do not document that he conveyed any such problems to her.

Moreover, despite meetings that Martinez and Union representative had with Harley, regarding his attendance and reporting problems sometime in late March or April 2008, and on July 28, 2008, November 21, 2008, and November 25, 2008, neither Martinez nor the Union representative raised the issue of his inability to comply with the minimum of

37

30-minutes advance notice requirement. The first indication Harley had that Martinez claimed that his medical condition prevented him from calling-in 30 minutes prior to the start of his shift to alert Harley to his FMLA absence was not until shortly after July 2009 when Jenks furnished Martinez with the second medical excuse letter.

Although Martinez testified at his deposition that his medication and his sleep disorder sometimes prevented him from calling-in 30 minutes before his shift, he has not established that he informed Harley of that problem during the time frame of his intermittent FMLA leave. Martinez also testified that he had a conversation in mid-2008 with Reed about the call-in requirement, but his recollection of that conversation is vague and he does not recall telling her anything other than he was having problems with the medication.

Proof of an FMLA interference claim does not require intent. However, common sense suggests that the employer would need to be aware that a serious medical condition made it impossible for the employee to comply with its own internal attendance protocol. Despite construing the evidence and the reasonable inferences from the evidence most favorably to Martinez, there is not sufficient evidence upon which a reasonable jury could find for Martinez on his interference claim.

While Martinez maintains that the Court of Appeals for this Circuit has not addressed a situation like his, *Brown,* 622 F.3d at 686, is analogous. The plaintiff, Letecia Brown ("Brown"), an assembly-line worker employed by Ford Motor Company was diagnosed with depression and alleged, among other things, that Ford's termination of her employment

38

interfered with her FMLA rights.  The appeals court upheld the dismissal of that claim upon summary judgment because she had not given proper notice to Ford as required by the FMLA regulations.

> However, for "completeness," the court also explained:
>
>> Ford was well within its rights (at least for FMLA purposes) to terminate Brown's employment according to its standard leave procedures.  FMLA regulations specifically provide that an employer may require employees "to comply with the employer's usual and customary notice and procedural requirements for requesting leave, absent unusual circumstances." *Id.*
>> § 825.302(d); *see Gilliam v. United Parcel Serv., Inc.*, 233 F.3d 969, 972 (7th Cir. 2000) ("Nothing in the FMLA or the implementing regulations prevents an employer from enforcing a rule requiring employees on FMLA leave to keep the employer informed about the employee's plans.").  In *Gilliam* we held that an employer does not violate the FMLA by terminating an employee who fails to follow the notice provisions of a collective-bargaining agreement. 233 F.3d at 971.  The plaintiff in that case had requested leave for one day to see his fiancée and newborn child, and his employer granted the request. *Id*. at 970. But he did not contact his employer again until five days later.  *Id.* He was then fired for violating the employer's notice procedures for leaves of absence, which required anyone who failed to report to work for three consecutive days to notify the company before starting time on the third day.  *Id.; see also Lewis v. Holsum of Fort Wayne, Inc.*, 278 F.3d 706, 710 (7th Cir.2002) (no FMLA violation where employee was terminated for failure to comply with company's attendance policy).

*Brown*, 622 F.3d at 690.  The court repeated that the FMLA does not "authorize employees on leave to keep their employers in the dark about when they will return." *Id.*  (quoting *Gilliam*, 233 F.3d at 971).

Case 2:10-cv-01081-RTR   Filed 09/06/12   Page 39 of 40   Document 47

Here, Harley's call-in requirement is designed to inform Harley if production workers will be absent so it can maintain its production schedule. Based on the record in this action, Harley's termination of Martinez's employment for his failure to comply with its Policy as incorporated into and approved by the CBA, did not interfere with Martinez's FMLA rights. Therefore, Martinez's motion for partial summary judgment is denied and Harley's motion for summary judgment is granted, and this action is dismissed.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT**:

Martinez's motion for partial summary judgment (ECF No. 24) is **DENIED**;

Harley's motion for summary judgment dismissing Martinez's FMLA interference and retaliation claims (ECF No. 34) is **GRANTED**;

This action is **DISMISSED**;

The Clerk of Court is **DIRECTED TO ENTER** judgment accordingly; and

Harley **MAY FILE** a bill of costs with the Clerk of Court;

Dated at Milwaukee, Wisconsin this 6th day of September, 2012.

**BY THE COURT**

**Hon. Rudolph T. Randa**
**U.S. District Judge**

40